

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DONALD MALEN and SHARON MALEN, | ) )  ) 05 C 6478 )   |
| Plaintiffs, | ) ) |
| v. | ) Hon. Charles R. Norgle ) |
| MTD PRODUCTS, INC. and HOME DEPOT U.S.A., INC., | ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the court is Defendant MTD Products, Inc.'s Motion for Summary Judgment. Defendant Home Depot U.S.A., Inc. has joined in this Motion. For the following reasons, the Motion is granted.

## I. BACKGROUND

### A. Facts

Plaintiffs are Donald Malen ("Donald") and his wife Sharon Malen ("Sharon"). Donald and Sharon are citizens of the State of Illinois. Defendant MTD Products, Inc. ("MTD") is a corporation incorporated under the laws of the State of Delaware with its principal place of business in the State of Ohio. MTD is engaged in the business of designing, manufacturing, and selling power equipment, including riding lawn mowers. Defendant Home Depot U.S.A., Inc. ("Home Depot") is a corporation incorporated under the laws of the State of Delaware with its principal place of business in the State of Georgia. Home Depot operates a chain of retail stores

1

throughout the United States that sells home improvement products, including riding lawn mowers.

Donald was born on October 12, 1940. Donald's deposition testimony indicates the following about his education and professional background. He attended Lane Tech high school in Chicago for three and a half years, and then studied architectural engineering at Chicago Tech for a year and a half. During his time at Chicago Tech, 1961 to1962, Donald worked as a group supervisor of draftsmen. He and the other draftsmen created Mylar drawings of electronic components. For approximately the next fifteen years, Donald worked as a contractor doing floor installations for a floor and wall covering company, Hite, Thomas and O'Brian. From approximately 1987 to 2002, Donald worked in a similar position installing floors and wall coverings for the Dallia Floor Company. During his career of over forty years in the flooring and wall covering industry, Donald received on-the-job training on a wide variety of power tools, including diamond blade wet saws, floor maintenance machines, edgers, floor sanders, warm gear skill saws, saber saws, hammer drills, regular drills, power actuated chisels, screw guns, and tile cutters. Donald also received instruction on the different safety mechanisms for these power tools. Donald was a member of Local Union 1185 of the Carpenter's Union throughout his career, and, as of the date of his deposition testimony, he was still a Union member. He retired from Dallia in 2002, at the age of 62.

On July 4, 2001, Donald purchased a riding lawn mower manufactured by MTD (the "Mower") from a Home Depot store in Mount Prospect, Illinois. Home Depot sold the Mower to Donald at a discounted price, $400, because the previous owner had returned it. A tag on the Mower read "Reconditioned, Full Manufacturer's Warranty." According to Donald, before

purchasing the Mower, Donald and an unidentified Home Depot salesperson took it outside the store to a parking lot where Donald operated the Mower in forward, reverse, and neutral, with the cutting blade both engaged and disengaged. Donald testified that he had operated riding mowers and tractors for approximately forty years before purchasing the Mower. He also testified that he operated the Mower for more than three years without incident prior to October 11, 2004.

On October 11, 2004, Donald was using the Mower to mulch leaves on the parkway of his Mount Prospect home. While Donald was proceeding west along the curb line, with the right wheels of the Mower immediately adjacent to the street curb, he drove the Mower's right front wheel over the curb. The Mower's right front wheel came to rest next to the curb, with the inside of the wheel touching the curb and the bottom of the wheel resting on the street. The Mower came to a complete stop, but the Mower's engine was still running and the cutting blades were still engaged. Donald remained seated with the mower in that position. Donald attempted to move the Mower back onto the parkway by driving it forward and rocking his body. Still seated, he also attempted to drive the Mower in reverse while rocking his body. He tried again with the Mower in forward gear, but he was unable while seated to move the Mower back onto the parkway. Donald then raised the cutting deck to its full height, took his feet off what he called the "go pedal" and the "blade engagement pedal" and got up, intending to dismount the Mower, walk to the front of the Mower, and lift it back up to the parkway. He did not use the key to turn off the engine. As he dismounted the Mower, Donald left the Mower in forward gear with the engine running and the blades engaged. Donald testified that before he dismounted the Mower, he did not check to see whether the blades were still spinning. He was, however, aware that the motor was still running. When he dismounted the Mower, his left foot slipped and went

3

underneath the cutting deck. The Mower's cutting blades then came into contact with Donald's left foot, resulting in severe injuries to the foot.

The physician who treated Donald on the day of the accident, Dr. Narendra Patel, offered a slightly different description of this incident.

> Mr. Malen is a 63 year-old gentleman who was, on October 11, 2004, on his riding lawn mower, at which point the riding mower went upon to a curb. He then tried to get the riding mower off the curb. While still remaining on the motor (sic), he took his left foot, [and] planted it on the ground. He was able to lift up the mower by the steering wheel and then with his right foot, he pressed the gas pedal forward to move it forward, but during this maneuver his foot got caught underneath the still-engaged blades of the land (sic) mower and [he] sustained a laceration.

Ex. E to MTD's Statement of Material Facts. It is not clear from the record where Dr. Patel obtained this information.

During the approximately three years Donald owned and operated the Mower, he never returned it to Home Depot, and never had any maintenance done on it. Donald testified that he recharged the Mower's battery a few times using his own charger. He further testified that he never changed the oil. Donald possessed the Mower for over three years and on October 11, 2004, the switch wires were not connected.

MTD manufactured the Mower in November, 1998. The Mower has two safety interlocks: the seat safety switch, or operator presence control ("OPC") and the no cut in reverse safety mechanism ("NCR"). The OPC is designed to cut power to the Mower's engine and blades if the Mower operator leaves the seat with the engine and blades engaged. The NCR is designed to cut power to the engine and blade if the operator shifts into reverse with the cutting blade engaged. Following the October 11, 2004 incident, the parties' experts inspected the Mower. The inspection determined that the switches to the OPC and NCR were not connected to

4

their respective wiring harnesses. Defendants assert that some unknown individuals disconnected the OPC wires at some point after the Mower was manufactured, and that "witness marks" confirm that these wires were properly connected during the manufacturing process. Plaintiffs disagree, and assert the lack of proper "witness marks" on the male seat switch indicates that MTD never properly connected the seat switch wires during the manufacturing process. The parties do not dispute that when the OPC and NCR switches were tested for continuity after the accident, it was determined that neither switch had failed. The parties also agree that the switches worked properly when the wires were connected during post-accident testing.

Defendants refer to the American National Standard Institute's ("ANSI") voluntary guidelines intended to provide safety specifications and requirements for riding mowers. These guidelines require that riding mower blades stop rotating within five seconds after they are disengaged or the OPC device is activated. The parties agree that when the Mower was tested with the OPC wires reconnected, the blades stopped within 2.6 seconds, which satisfies ANSI's guidelines. If the wires are cut or disconnected, neither protective switch would function.

The parties also agree that warning labels were clearly affixed to the Mower. These warning labels were in place when Donald purchased the Mower and no party asserts that the warning labels were not in place during the four years Donald operated the Mower, including October 11, 2004. One of the labels reads, in part: "DO NOT OPERATE THE UNIT WHERE IT COULD SLIP OR TIP . . . BE SURE BLADE(S) AND ENGINE ARE STOPPED BEFORE PLACING HANDS OR FEET NEAR BLADES. BEFORE LEAVING OPERATOR'S POSITION DISENGAGE BLADE(S). PLACE THE SHIFT LEVER IN NEUTRAL. ENGAGE

5

THE PARKING BRAKE. SHUT OFF AND REMOVE KEY." Donald testified that he was aware of this warning label, but he is unsure whether he read it in its entirety. Donald also testified that before he dismounted the Mower just prior to the accident, he did not turn off the Mower's engine or remove the key. Another label reads "DO NOT PUT HANDS OR FEET UNDER CUTTING DECK OR NEAR ROTATING PARTS." Donald has testified that he understood the language on this label, and that in general, he was well aware that there was a significant danger associated with the use of rotating lawn mower blades.

## B. Procedural History

Donald and Sharon originally filed their four count Complaint at Law in the Circuit Court of Cook County, Illinois. Donald alleges Strict Liability (Count I) and Negligence (Count II), and Sharon alleges Loss of Consortium – Strict Liability (Count III) and Loss of Consortium – Negligence (Count IV). On November 14, 2005, Defendants removed the case to the Northern District of Illinois, invoking the court's diversity jurisdiction. After examining the pleadings, the court is satisfied that complete diversity exists in this case, and that the amount in controversy exceeds $75,000. See Tylka v. Gerber Prods. Co., 211 F.3d 445, 447-48 (7th Cir. 2000).

MTD filed its Motion for Summary Judgment, which Home Depot joined, on May 15, 2008. The Motion is fully briefed and before the court.

## II. DISCUSSION

### A. Standard of Decision

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In order to survive a motion for summary judgment, the nonmoving party must identify specific

facts that show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999); Cornfield v. Consolidated High Sch. Dist. No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. FED. R. CIV. P. 56(c); see also Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir. 1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996).

When adjudicating a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from facts; these are jobs for a factfinder." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). "[T]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). The court must therefore "look at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." Payne, 377 F.3d at 770.

## B. Defendants' Motion for Summary Judgment

Defendants assert that they are entitled to summary judgment for the following reasons: the Plaintiffs' strict liability claims fail as a matter of law because the danger involved in operating the Mower was open and obvious; the Plaintiffs cannot establish a prima facie case for

7

strict liability under a manufacturing or design defect theory; and the Plaintiffs cannot establish a prima facie case of negligence.

### 1. Strict Liability

In Illinois, "strict liability is imposed upon a seller 'of any product in a defective condition unreasonably dangerous to the user or consumer or to his property.'" Calles v. Scripto-Tokai Corp., 864 N.E.2d 249, 254 (Ill. 2007) (quoting RESTATEMENT (SECOND) OF TORTS § 402A (1965)); Suvada v. White Motor Co., 210 N.E.2d 182 (Ill. 1965). Illinois law recognizes two subsets of strict product liability: manufacturing defects and design defects. Blue v. Environmental Engineering, Inc., 828 N.E.2d 1128, 1137-38 (Ill. 2005).

> A manufacturing defect differs from a design defect in that the former occurs in only a small percentage of units in a product line, whereas the latter arises when the specific unit conforms to the intended design itself, or its sale without adequate instructions or warnings, renders the product not reasonably safe.

Id. at 1137.

A plaintiff alleging strict product liability in Illinois must show "(1) that an injury resulted from a condition of the product; (2) that the condition was unreasonably dangerous; and (3) that the condition existed at the time the product left the manufacturer's control." Cozzi v. North Palos Elementary Sch. Dist. No. 117, 597 N.E.2d 683, 687 (Ill. App. Ct. 1992); Mason v. Caterpillar Tractor Co., 487 N.E.2d 1043, 1047 (Ill. App. Ct. 1985).

It is well-established in Illinois that a plaintiff must prove the first element of strict product liability, that the alleged defect in the product in question proximately caused his or her injury, in order to recover. "A defect in the product must be the proximate cause of the plaintiff's injury, and a legal inference of defectiveness may not be drawn merely from evidence

8

that an injury occurred." Mason, 487 N.E.2d at 1047 (citing Barr v. Rivinius, Inc., 373 N.E.2d 1063 (Ill. App. Ct. 1978)); Depre v. Power Climber, 635 N.E.2d 542, 543-44 (Ill. App. Ct. 1994) ("The fact that an injury occurred does not in and of itself prove that a product is defective. Rather, the plaintiff must show that his injuries derived from a distinct defect in the product which subjects those exposed to the product to an unreasonable risk of harm.") (citing Kokoyachuk v. Aeroquip, 526 N.E.2d 607 (Ill. App. Ct. 1988)); Taylor v. Gerry's Ridgewood, Inc., 490 N.E.2d 987, 991 (Ill. App. Ct. 1986).

Illinois courts use two tests to determine whether a product is unreasonably dangerous: the "consumer expectation test" and the "risk utility test." Calles, 864 N.E.2d at 250. Under the consumer expectation test, originally used in manufacturing defects cases but later applied to design defect suits as well, "[a] product is 'unreasonably dangerous' when it is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community and its characteristics.'" Id. at 254-55; Blue, 828 N.E.2d at 1138 (quoting Lamkin v. Towner, 563 N.E.2d 449 (Ill. 1990)). The plaintiff has the burden, under this test, of establishing what the ordinary purchaser of the product at issue would expect about the product itself and its safety. Calles, 864 N.E.2d at 255. This standard is an objective one, "based on the average, normal, or ordinary expectations of the reasonable person; it is not dependent upon the subjective expectations of a particular consumer or user." Id. Under the risk-utility test, an alternative test used in design defect cases, a plaintiff must show that "the magnitude of danger outweighs the utility of the product, as designed." Id. at 257. In other words, "'the utility of the design must therefore be weighed against the risk of harm created,' and 'if the likelihood and gravity of the harm outweigh the benefits and utilities of the

9

product, the product is unreasonably dangerous.'" Id. (quoting 63A AM. JUR. 2d Products Liability § 978 (1997)).

In this case, the Plaintiffs allege that the Mower was both defectively manufactured and designed. Defendants' first assertion in their Motion for Summary Judgment is that Plaintiffs' strict liability claims must as a matter of law fail because the dangers of operating the Mower were open and obvious. Under Illinois strict products liability law, however,

> the open and obvious nature of the risk is just one factor to be considered in the range of considerations required by the risk-utility test, and it will only serve to bar the liability of the manufacturer where it outweighs all the other factors to be considered in weighing the inherent design risks against the utility of the product as manufactured.

Blue, 828 N.E.2d at 1145; Calles, 864 N.E.2d at 260 ("we hold that the open and obvious danger of a product does not create a *per se* bar to a manufacturer's liability . . . . [T]he open and obvious nature of a danger is one factor that may be weighed in the risk-utility test."). Other factors relevant in a risk-utility analysis under Illinois law include: the usefulness of the product to the user and the public; the likelihood that the product may cause injury; the potential seriousness of the injury; the availability of a suitable substitute product; the ability of the manufacturer to eliminate the potential danger without adversely affecting the product's utility; and the convenience of using the product. Calles, 864 N.E.2d at 261. It is at least arguable that the dangers of using a riding lawn mower with rotating, sharp metal blades is or should be open and obvious to the ordinary consumer. However, the court cannot find as a matter of law that the arguably open and obvious dangers inherent in the operation of lawn mowers outweighs the numerous other factors it should consider in its risk-utility analysis. See id. at 259 ("the

10

obviousness of a risk inherent in a product . . . does not by itself obviate a manufacturer's liability.").

Defendants also assert that Plaintiffs cannot establish a case for strict liability because (1) Donald's actions, rather than any alleged defects in the Mower, were the proximate cause of his injuries, and (2) Plaintiffs have provided no evidence that the Mower was defective. Because the court finds Defendants' first assertion dispositive of Plaintiffs' strict liability claims, the court does not reach Defendants' second assertion.

As the court has noted, in order to obtain relief in a strict product liability action, the plaintiff must first establish that the alleged defect was the proximate cause of his or her injuries. Mason, 487 N.E.2d at 1047. In this case, Plaintiffs assert that alleged defects in the Mower caused Donald's injuries. However, during his deposition, Donald testified to the following. Before he purchased the Mower, Donald and a Home Depot salesman took the Mower to the Home Depot parking lot, where Donald test drove the Mower.

> DONALD: So between him and me, we, you know, they had the details on the side of the – of the machine stating on how you can go about operating the machine, how to start it. So between him and I, we figured out how to start the machine. And from that point, I actually got on the machine and went through the steps of engaging the blade and putting it in forward and back into neutral and reverse and tested the machine, you know, and it sounded fine.

Malen Dep., at 85. He also testified that he had operated riding mowers and tractors for over forty years, and never got off these machines if the blades were running.

> DONALD: In all the years passed and all the times that I've operated these mowers or tractors, I mean I've been doing this for over 40 years. It was just a normal routine to – when I was getting ready to start cutting, I would engage the blade; and when I got through cutting, I would disengage the blade. It was never a practice to get off of the machines with the blade running.

11

Id. at 89-90. Donald also testified that when he purchased the Mower, there were warning labels attached to it. Id., at 99-100; see supra § 1A. He testified further that he had used the Mower on a regular basis during the spring, summer, and fall months between the date he purchased the Mower, July 4, 2001, and the date of the accident, October 4, 2004. Malen Dep., at 126. At the time of the accident, Donald testified, he was operating the Mower on his parkway, with the wheels of the Mower immediately adjacent to the street curb. Id. at 145. Donald was driving the Mower at a medium speed, with the Mower's cutting deck raised to a middle level. Id. at 146-48. At some point, Donald drove the Mower's right front tire over the curb and onto the street. Id. at 149-50. The Mower came to a stop. Id. at 162. Donald testified that he raised the cutting deck, and attempted to rock the Mower back and forth, using his body and the Mower's forward and reverse gears. Id. at 163-66. When that failed, Donald testified, he attempted to dismount the Mower with the intention of lifting it back onto the parkway. Id. at 164.

Donald testified that he did not turn off the engine, place the gear shift in neutral, engage the parking brake, or remove the key before he dismounted the Mower. Id. at 213-14. He then dismounted the Mower, slipped, and was injured when his left foot moved into the path of the spinning blades. Id. at 174-76. Donald testified that after he fell to the ground and was injured, he reached up and used the key to turn off the engine. Id. at 194. It is undisputed that a warning label clearly visible on the Mower reads, "DO NOT OPERATE THE UNIT WHERE IT COULD SLIP OR TIP . . . BE SURE BLADE(S) AND ENGINE ARE STOPPED BEFORE PLACING HANDS OR FEET NEAR BLADES. BEFORE LEAVING OPERATOR'S POSITION DISENGAGE BLADE(S). PLACE THE SHIFT LEVER IN NEUTRAL. ENGAGE THE PARKING BRAKE. SHUT OFF AND REMOVE KEY."

The court determines that, given the admissions Donald has made in his deposition testimony, and taking into account Dr. Patel's slightly different account of the accident, any alleged defects in the Mower could not have been the proximate cause of Donald's injuries. "The term 'proximate cause' encompasses two distinct requirements: cause in fact and legal cause." Young v. Bryco Arms, 821 N.E.2d 1078, 1085 (Ill. 2004). Cause in fact is established where "there is a reasonable certainty that a defendant's acts caused the injury or damage." Lee v. Chicago Transit Authority, 605 N.E.2d 493, 502 (Ill. 1992) ("defendant's conduct is a factual cause of the plaintiff's injury if the conduct was a material element and a substantial factor in bringing about the injury."). Legal cause is established when "the defendant's conduct is 'so closely tied to the plaintiff's injury that he should be held legally responsible for it.'" Young, 821 N.E.2d at 1086 (quoting Simmons v. Garces, 763 N.E.2d 720, 732 (Ill. 2002)). An assessment of foreseeability should play an important role in analysis of legal cause. Young, 821 N.E.2d at 1086. Courts may determine lack of probable cause as a matter of law. Id.

In this case, the court determines that Defendants' alleged actions in this case could not have been the actual cause of Donald's injuries. Donald has admitted that he (1) drove the Mower off the curb, (2) was aware of and understood the warning labels on the Mower, and (3) ignored those labels by dismounting the Mower with the cutting deck raised, the engine running, and the cutting blade engaged. Any alleged defect in the mower therefore could not have been a "substantial factor" in bringing about Donald's injury. See id. Moreover, the court finds that, given Donald's actions in precipitating this accident, any alleged defect in the Mower could not have been the legal cause of Donald's injuries. See id. ("As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and

13

of such significance that the law is justified in imposing liability.") (quoting PROSSER AND KEETON ON TORTS § 41 (5th Ed. 1984)). Defendants could not have foreseen that any individual would drive a riding mower off a curb and dismount that mower with the cutting blades still engaged, all the while ignoring clearly placed warning labels cautioning the operator to turn off the engine and blades before dismounting. See id. (inquiries into foreseeability involve asking "whether the injury is of a type that a reasonable person would see as a likely result of his conduct.").

Because Plaintiffs in this case cannot establish the first element of a strict product liability claim in Illinois, that an alleged defect in the Mower was the proximate cause of Donald's injuries, the court does not reach the question of whether the Mower was unreasonably dangerous. See Cozzi, 597 N.E.2d at 687. Defendants' Motion for Summary Judgment as to Plaintiffs' Strict Liability counts is therefore granted.

### 2. Negligence

In Illinois, product liability cases asserting negligence fall under the familiar standard of common law negligence. Calles, 864 N.E.2d at 263. The Plaintiffs in this case must therefore "establish the existence of a duty of care owed by the defendant, a breach of that duty, an injury that was proximately caused by that breach, and damages." Id. (citing Ward v. K Mart Corp., 554 N.E.2d 223 (Ill. 1990)). It is well-established that "the burden of proof remains on the plaintiff throughout the proceedings to prove all the elements of negligence." Blue, 828 N.E.2d at 1142 (citing Sullivan v. Edward Hospital, 806 N.E.2d 645 (Ill. 2004); Purtill v. Hess, 489 N.E.2d 867 (Ill. 1986)). In negligence product liability claims, the plaintiff must demonstrate that the defendant was somehow at fault, in addition to demonstrating that the product at issue

was defective. <u>Calles</u>, 864 N.E. 2d at 263-64. As the court has already established, however, the Plaintiffs cannot show that any defect in the Mower was the proximate cause of Donald's injury. The court therefore does not reach the issue of fault, or any of the other elements of negligence in Illinois. Defendants' Motion for Summary Judgment as to Plaintiffs' Negligence counts is therefore granted.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATED: October 10, 2008